### J. R. HEWITT V. THE STATE.

No. 2514. Decided June 27, 1913.

**1.—Pandering—Charge of Court—Definition of Offense.**

Where the indictment charged that the defendant procured the alleged female to leave this State for the purpose of prostitution, under the Act of 1911, page 29, defining the offense of pandering, and there was evidence that the defendant at no time undertook to induce said female to let other men have intercourse with her or to induce her to go to a house of prostitution, but on the contrary did what he could to prevent her from doing so, and the State's case in its strongest light would only present a case of adultery, the court's failure to charge on and define prostitution under the statute of pandering was reversible error.

**2.—Same—Prostitution—Illicit Intercourse.**

The term, "prostitution," may have, and does have different meanings, owing to the sense in which the term is used. Illicit intercourse, which in a sense is prostitution, is differently defined in Texas, owing to the matter upon which legislation is enacted, and the act of pandering, as now defined by statute, differs from all the other offenses with reference to illicit intercourse between man and woman, and is intended to cover all those acts on the part of any person to induce any female to submit her body to other men for the purpose of prostitution, and this whether the woman is virtuous or not, and excludes the idea of living in adultery with the accused.

**3.—Same—Pandering—Definition.**

By the use of the word pandering, it was intended by the Legislature to make this a separate offense consisting of the acts denounced, differentiating it from other means of sexual intercourse, and under which the accused must

do something to induce the woman to lead a life of shame by some of the means or ways interdicted by the statute, and to submit her body to the sexual desires of other men; and the Act is not intended to in any way impugn or interfere with the other statutes on the books with reference to illicit intercourse, such as adultery, etc.

#### 4.—Same—Indictment.

An indictment for pandering should allege the name of the State in which the female was induced to go.

Appeal from the District Court of Knox. Tried below before the the Hon. Jo. A. P. Dickson.

Appeal from a conviction of pandering; penalty, fifty years imprisonment in the penitentiary.

The opinion states the case.

*Cunningham & Sewell,* for appellant.—Cited cases in opinion, and State v. Rorebeck, 59 S. W. Rep., 67; State v. Wilkinson, 26 S. W. Rep., 366; Bunfill v. People, 154 Ill., 640 (39 N. E. Rep.) ; 1 Enc. Ev., p. 37.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was indicted under the Act of 1911, page 29, prohibiting what is termed by the Act pandering.

It is unnecessary to notice any of the counts, there being nine contained in the indictment, except the ninth. This count alone was submitted by the court to the jury, all the others being expressly withdrawn in the charge. Omitting formal parts, this count charged that "J. R. Hewitt did by fraud and artifice and by duress of the person of Alma Johnson, a female, and by the abuse of his, the said J. R. Hewitt's, position of confidence and authority with and over the said Alma Johnson, a female, procured her, the said Alma Johnson, a female, to leave this State for the purposes of prostitution. Against the peace and dignity of the State."

Alma Johnson testified that she lived at Bomarton, in Knox County; that she was over at Goree in the same county; that she was an unmarried woman, and had never been married. Appellant was a Baptist minister and had charge of a congregation at Goree. Prosecutrix was also a member of the Baptist church at Bomarton, Texas. Appellant was a married man. Prosecutrix visited the home of appellant, and his wife, and while there "love making" occurred between them. This began about three months before he had intercourse with her. This intercourse seems to have occurred the first time at his house on the 19th or 20th of May. She visited appellant's house several times, and that her senses did not trace exactly what was meant, but little by little it dawned on her, and what she called "confessing love" took place at her father's store. He approached her there as a married man and told her that he loved her, if there was such thing as love, and she told him he had a wife, and he said, "That God made some people but he does not make all," and that she was his mate. This continued for some time,

and finally during his love talking he asked her in a roundabout way what she would do if someone would come to her room at night, and she said she would scream, of course, and that she could not do such a thing as letting a man into her room. She said she naturally looked up to people that were preachers of the gospel of Jesus Christ, and never thought of them using that for the purpose of snaring girls; that she had more confidence in both him and his wife. On the night of the first act of intercourse she said she could have locked the door, "but had no more idea that the man would attempt anything of that kind than I dreamed of hell. Near midnight he came there but still I was awake, he came to my bed. I didn't know who he was until he got there, and I shoved him away from me several times; he would not leave me, and I told him I would scream for help; when I told him that he held his hand over my mouth for a good long while. When he let hold of me I didn't scream, I don't know why, but I did not; I was so nervous I was almost prostrated; and then after a little struggle then was when the first act was committed." Without following this up with the details, there were several acts of intercourse between them. Finally they went to Dallas, she contending that he insisted on her going, and that he had her under hypnotic control and that she went, "never consenting, yet she did consent." Appellant took the train at Goree, and she went from Goree to Munday and there took the train, and when she got on the train appellant was there. He told her nothing of the arrangements, but just told her he was going to take her off, and the arrangements were made by him, and she did nothing but worry, cry and talk. She said: "I met him at the train and went off with him by his instructions. I don't know why I did it, but I feared to stay at home in the condition I was, that is why I left home. For being forced into intercourse I thought my condition was a pregnant condition, and I wanted to get away and hide it; but I did not want to leave, he almost forced me, you might as well say by force, for time and time again he would ask me and sometimes I would say yes, and again I would say I would not go, and that I never would go; then he would just start his love talk, and say, 'Well, you love me in your mind, you know what has taken place,' that is the talk he made, and he says, 'You will stay with me and take the consequences that come afterwards,' and I said, 'I would not take the consequences for it, that I was not responsible.'" They went to Dallas and there registered at the St. George hotel under the name of Dr. DeWitt and wife from Chicago, Illinois, and she says she was supposed to be his wife; they occupied a room at the hotel two or three days and had carnal intercourse there, and slept together at night. They went from there to a boarding house in the city and stayed there for five or six days, still under the name of Dr. DeWitt and wife. There were other people boarding at the same place. During the five or six days at this boarding house they occupied the same room and bed. He left her at this boarding house and went back to Goree and was gone three days and returned. She says on his return he commented upon

why the people at Goree did not understand what was going on between them, but it showed to him these people were lacking in intelligence. She says that they left the boarding house above mentioned and went to the residence of Mr. Joseph, also in Dallas, in the residence district, and stayed there exactly one month. While at Dallas she says she worked at the "General Agency" to earn money; that she sold toilet articles, sometimes she would take orders and sometimes she would just deliver the articles. While boarding there they still went under the name of DeWitt and wife. While there he again returned to Goree and was gone four days, and upon coming back remarked how blindfolded the people were over there; that while there he got money from her father, $25, for the purpose of hunting her. The father testifies that he let appellant have $25; and appellant suggested to him the propriety of going along with him to assist in finding the girl, but he finally declined going. After remaining in Dallas a while he left there and went to Swan and got work in an orchard while she remained for two weeks in Dallas, and obtained work as a housekeeper. From Swan appellant wrote to her and she went to him at Swan. They remained there four or five days, each one doing their respective work trying to make a living. From Swan they went to Shreveport, Louisiana. There they registered as man and wife under the name of Oscar Allen and wife, and lived together, occupying the same room as husband and wife. In Shreveport they hunted for a proper home in which to live, and stayed about three or four days in one house and went to. another and rented rooms for light housekeeping, and were there a month or nearly a month. From there he went to another point in Louisiana and wrote to her and she wrote to him. She declined to go with him and wrote her father and obtained money and returned to his residence in Knox County. While they were together she mentions a great many facts and circumstances occurring between them and conversations and how he would pet her and call her baby and other pet names. Now in regard to the evidence bearing upon the question of pandering, it is about this way: "As to anything being said to me by him about me leading the life of a prostitute, he would often say about me, and about my clothes, that I looked and acted very much like a common prostitute, then again he would say something about the prostitutes, how they would live and wear silks and diamonds; he would also relate to me everything that went on in a house of that kind; also he said he had been in those houses so much that he didn't realize hardly what a house of ill-fame was. He did not come straight out and ask me how I would like that kind of a life, but he would often ask me if I wouldn't like to be earning money, and wear silks and diamonds, then was when he would call me baby and pet names like that. Then I would tell him no, that I wouldn't do such a thing; then at times he would again talk and tell me what horrible places they were, and of things he had seen in them, and of what he had done; then I would ask him to stop, I would tell him with tears to respect me. I say that he did detail to me the manner of carrying

on business in these houses. As to him saying anything about getting part of the money, I will say: That so far as clothes are concerned, of course, he knew that I liked to look neat, but I didn't care for fine clothes; he would often call me by some endearing name, and say, 'Why, my goodness, Alma, you could be wearing diamonds, you could be wearing satins of all colors,' and be making an easy living. I was to earn that money by the houses of ill-fame; later he related to me how he could get us a nice little room, then I could have male company and thereby earn money; and of course he would take part of the money; that was part of the plans. But I refused to do that. He left me soon after that; he left me down in Shreveport; he pretended to have no money; I don't know whether he did or not; he left the bill for me to pay; I didn't have any money and I got help there from some of the Christian women. I went first to a lady in the depot and she gave me the names of several women. I went there and at last I got work and stayed there and worked for about two weeks, then I wrote home to my father." She further testified in this connection that he asked her in case she wanted assistance in his absence, after he left her in Shreveport, to call on these Christian women for assistance.

Going back to her detailed testimony as shown on cross-examination, she says: "I went to his home twice and stayed all night after he hugged and kissed me in the buggy. I went to his home more than that but I did not stay all night. I did not fall in love with this man. I liked him because he was a preacher. I put more confidence in him. The reason I submitted to these various acts of intercourse was because he had a hypnotic power and his wife had the same; I could not resist him, but I did resist him until after he forced me." There is some testimony brought out on cross-examination as well as original testimony which shows that the reason she went to Munday was to have some dental work done, and that she contemplated going to Stamford and take music lessons. She says the first place she stayed all night with him was at Abilene; they stayed at a first-class hotel there. "He did not warn me against prostitution and tell me the horrors of a prostitute life, but he would often say he would not like to see me a prostitute, and at times he would say he would like to see me one; he would say my actions were nothing but a prostitute girl. He did not tell me on many occasions that he had rather see me dead than to enter into a life of that kind. He did refer to my dead mother, as her being in heaven and what she would say of my being in prostitution." She says further: "When he left Shreveport I did write him a letter; in that letter I did not ask him for money, but I told him I was lonesome, and I was. I don't remember whether I signed that letter 'with love' or not. The defendant's wife swore she would give him a divorce, and we discussed the fact of marrying after he got the divorce, but I never would have married the man; but I probably said I would after he had forced me into what he would; but that was not my purpose and intention when I left Goree; it might have been his intention when we left the State of Texas; but it was not

my intention; nor did he communicate that intention to me. He would very often say that he wanted me to become his wife. I don't think it was his intention in going to Louisiana and New Orleans to hasten the divorce proceedings so he could marry me. He did not get a position at Dallas; he phoned to those ladies and I got my position, he just made arrangements for me to go there." She says, "Before we left Knox County, the defendant would often mention about my conduct; of course I was young and I was jolly, he was older than I was; and he would often say that I conducted myself very much like a prostitute; then in connection with that he would bring in about New Orleans; and in that same connection at times he would warn me against that kind of place, and for me to be careful not to go into that kind of life."

Appellant says: "When I left Goree on that first trip I went to a Sunday school convention; at that time it was generally known I was going to the convention. Miss Johnson found out I was going from the current talk, and she suggested that she would go along with me, and I advised her not to go. I don't remember just what I told her, but I told her it would only be a matter of time until it would be a disgrace to myself and also to her, for simply he had not been appointed as a delegate, and being a young girl and myself a married man, it would never do for the two of us to travel alone on the train. At that time she wanted to go, or it was her desire to go. On the evening prior to the time I was to start to the convention she came from Bomarton to Goree, and stayed at my house that night. At that time she mentioned it more in a joke than anything else; she said, 'I am going to the convention'; also Mrs. Hewitt was in the room at that time. I just took it more as a joke, and I don't know that I gave her an answer at that time. The statement she made to Mrs. Hewitt was that she was going to take the train back to Bomarton the next morning; I think it was more of a visit to Goree than anything else." He denied giving her money as she testified he had done. Further testifying, he says: "On the way between Goree and Bomarton this Sunday school convention come up again, and I says, 'Why, Miss Alma, you are certainly joking about that, I would be only too glad to have you go along,' but, I says, 'It would never do for you to go along with me, for the simple reason I am a married man,' and without seeming unlady-like, she says, 'I have just as much right on the train as anybody.' I says, 'Well, you will get off at Bomarton all right.' She was sitting on the inside of the seat, and I got up as we got to Bomarton; when the train pulled in I got up and asked her if she wanted me to assist her off, and she says, 'I am not going to get off,' then I talked to her and tried to persuade her it was best for her to get off and not go on through. As we left Bomarton we passed the livery stable that was owned by a man by the name of Williams, and the boy that runs the stable was standing there and she dodged her head, and I says, 'What did you do that for?' and she says, 'I did not want him to see me.' I says, 'That one thing shows it is not right for you to be with me.'" He denied emphatically, without going

further into detail along this line of the testimony, that he did induce her to go with him, but objected to it and urged her not to do so. He also testified to some matters that occurred between prosecutrix, himself and her father at Stamford, where they had a conversation, in which he informed the father the girl was on the train. When they reached Abilene they got in the bus and went on over to the main station; she went in the ladies' waiting room and he went in the smoking room. He met a friend there and talked with him. On the way between Abilene and Munday the subject was brought up about her going, and she told him she was going with him to Dallas, and he tried to persuade her from following this course, but could get no answer from her except she would shake her head, that is, with regard to that one subject. The second trip they stayed in Dallas about a week; that he went back to Goree and Bomarton and filled his appointments. She was there with appellant all the time. He narrates a conversation that occurred between himself and the father of the girl, the daughter being the subject of ·the conversation, and during which conversation he obtained $25 to assist in hunting the girl, and wanted her father to go with him, which he declined to do. He then narrates their stay in Dallas and his going away from Dallas. He says: "I did try to get her to remain at her father's house. I did not have any intention or purpose in taking that girl and having her enter into a life of prostitution and shame. I spoke with regard to that life, and never suggested as to her taking it up, I rather warned her against it. I think when I first decided upon the plan of going to Louisiana was at Swan, Texas; it was either at Swan or some town on the Texas & Pacific Railroad. When I left Dallas I went to Big Sandy, from there to Tyler, and then to Swan. I was looking for work, something that would pay me better than what I had. Before I left Dallas I arranged for a position for her as a companion and housekeeper for two ladies. It was Sunday when I did the phoning. She accepted the position with the ladies, and later joined me at Swan. I got a letter from her in the meantime, in that letter she told me she was coming, and for me to meet her at the train. I went to Longview, from there to Marshall, and from there to Shreveport. At no time did I take her to an indecent place. When I was in Shreveport I took her to a private residence. If I had wanted to I don't see any reason why I couldn't have taken her to a house of prostitution, but I did not do such a thing. I had several different conversations with her with regard to warning her against that kind of life, and I had such a conversation with her at Shreveport. If I have to say it I will, but I had rather not; but I do remember something being said about prostitution, but it was more in a joking way, I want you to realize that, than any other way, because the party never meant it for a moment. We were very short financially, and she said to me, she says, 'I can very easily go out on the street and in a short time come back with $5,' and then she laughed; I knew it was a joke, that she didn't mean it for a moment. Then I looked at her and I said, 'Alma, how do you think your mother

in heaven would look on what you have mentioned?' I spoke to her about her mother several times, I says, 'Alma, if I leave you I had rather see you dead in a corpse at my feet than to see you a prostitute.' I had rather see any respectable girl dead in a corpse at my feet than a prostitute. When I left Shreveport I had some optical cases to call on, and when I left there she walked out with me on the street. We stopped on the corner of the street, and I says to her, 'Alma, I am going off now, it is fully two or three weeks before the rent is due and by that time I will be in a position to send you some money.' I says, 'I have enough money to buy a ticket to Baton Rouge, about $3.' Shreveport is ninety-eight miles from New Orleans, and I told her I had two or three dollars left and I gave her half of it, and I said I would send her some money in a few days, and I says, 'Whatever you do be careful,' and the very last minute I saw the distance I was from her in my mind's eye, and her in that town alone and perhaps she would make a mistake, and I says to her, 'I will give you a little advice,' and I advised her to go to Mr. Jones or go to some of the Christian women and get them to help her to get a position; I spoke of the temptations and I said if you get in a tight the best thing for you to do is to telegraph to your father, to get in touch with him, and that I would come for her as soon as I could. That is the last thing I saw of her until today. At the time I was in Knox County I had no purpose, intention or desire of taking this girl into prostitution. My purpose in taking her to New Orleans was to arrange just as soon as possible to get in touch with Mrs. Hewitt and make further arrangements to get her divorce." He and his wife had separated, and it was with the understanding she was to get a divorce, and he was to make prosecutrix his wife. Without going further into the details of this matter, this above statement, while little long and tedious, is thought necessary to bring in review one of the main questions in the case.

Exception was properly and timely reserved to the court's failure to charge on and define prostitution under the statute of pandering. It was under this statute this indictment was presented. Appellant's contention is, take the State's case in its strongest light, it would only be adultery, he being a married man, the girl unmarried. That at no time did he undertake to induce her to let other men have intercourse with her, or to induce her to go to a den of prostitution, but on the contrary did what he could to prevent her from doing either and both, and urged and advised her against it all the time with the ultimate view of making her his wife when his wife obtained a divorce. If it be thought that the evidence of prosecutrix was sufficient to submit the question of pandering, then under some of the girl's testimony as well as that of the defendant we are of opinion that the court should have properly instructed the jury as contended by appellant, as to what it took to constitute prostitution under the pandering Act, and if they were simply living in adultery, then appellant would not be guilty of pandering. While it may be her testimony is sufficient, under one phase of it, for

the jury to have inferred or believed that he took her to Louisiana for the purpose of inducing her ultimately to go into a den of prostitution, still it was a very seriously controverted issue, and the other side of the case should have been properly presented. The term "prostitution" may have and does have different meanings, owing to the sense in which the term is used. Illicit intercourse, which in a sense is prostitution, is differently defined in Texas, owing to the matter upon which legislation is enacted. We have adultery, for instance, where one of the parties must be married. We have fornication in which it is necessary that both parties be unmarried. Both statutes are based upon illicit intercourse between man and woman. We have kidnapping, then we have abduction and disorderly houses, and false imprisonment, and procuring, and various other things connected with disorderly houses. The Act of the Legislature with reference to pandering reads as follows: "Any person who shall procure or attempt to procure or be concerned in procuring, with or without her consent, a female inmate for a house of prostitution, or who, by promises, threats, violence or by device or schemes, shall cause, induce, persuade or encourage a female person to become an inmate for a house of prostitution or shall procure a place as an inmate in a house of prostitution for a female person, or any person who shall, by promises, threats, violence or by any device or scheme, cause, induce, persuade or encourage an inmate of a house of prostitution to remain therein as such inmate, or any person who shall, by fraud or artifice, or by duress of person, or goods, or by abuse of any position of confidence or authority, procure any female person to become or remain an inmate of a house of ill-fame, or to enter any place in which prostitution is encouraged or allowed in this State, or to come into this State or leave this State for the purpose of prostitution, or who shall procure any female person to become an inmate of a house of ill-fame within this State, or to come into this State or to leave this State for the purpose of prostitution, or who shall give or agree to receive or give any money or thing of value for procuring, or attempting to procure, any female person to become an inmate of a house of ill-fame within this State, or to come into this State or leave this State for the purpose of prostitution, shall be guilty of pandering, and, upon conviction for an offense under this Act, shall be deemed guilty of a felony and shall be punished by confinement in the penitentiary for any term of years, not less than five."

The caption of this bill is as follows: "An Act creating the offense of pandering, and to define and prohibit the same; to provide for the punishment thereof, for the competency of certain evidence at the trial therefor, and providing what shall not be a defense, and declaring an emergency."

So it will be discovered that this Act was intended to cover all those acts, conduct, device, etc., on the part of any person to induce any female to submit her body to other men for the purpose of prostitution, and whether they even succeeded in inducing her to do so. And it would

seem to make no difference whether the woman was virtuous or not. The essential fundamental proposition underlying the whole case is that the accused should do something to induce the woman to submit her body to the sexual desires of another man, or other men, or to become the inmate of a den of prostitution. It excludes the idea that she is only living in adultery with the accused. The idea is that the accused is doing something to induce the woman to lead a life of shame by some of the means or in some of the ways interdicted by the statute. It will be clearly noticed that this is not a statute against illicit intercourse as between two parties. That is fully provided in other Acts of the Legislature, but is confined to what the Legislature has termed "pandering." By using this expression and defining the word as it has been defined, it was intended by the Legislature to make this a separate offense consisting of the acts denounced as differentiating it from other means of illicit sexual intercourse and matters of that sort. By the Century Dictionary the word "pander" is defined as follows: "One who caters for the lusts of others; a male bawd; a pimp or procurer. One who ministers to the gratification of any of the baser passions of others. To cater for the lusts of others. To minister to others' passions or prejudices for selfish ends." Webster in his dictionary thus defines it: "A male bawd; a pimp; a procurer. Hence one who ministers to the evil designs and passions of another. To play the pander for. To act the part of a pander. Panderism: The employment, arts, or practices of a pander." Mr. Webster seems to indicate the word comes from Pandarus, a leader in the Trojan army, who is represented by Chaucer and Shakespeare as having procured for Troilus the possession of Cressida. So this is a statute to prohibit pandering, enacted for that purpose and that alone, and was clearly not intended to in any way impugn or interfere with the other statutes on the books with reference to illicit intercourse, such as adultery, fornication, kidnapping, abduction, or any of those matters where illicit intercourse occurred, and seems to exclude the idea that the act between the male and individual man who is a pander, but is the act between the woman and the other man whom the pander induces the woman to live with or the institution of ill-fame to which she is induced to go. In other words, pandering is the inducement by the pander to induce a woman to submit to other men than himself, and that is the sense in which prostitution is understood under this statute. This seems to be the idea of the decisions of the State wherever the matter has come before the courts. See Haygood v. State, 98 Ala., 61; State v. Stovell, 54 Me., 24. Those two cases and the authorities cited in them seem to be sufficient, if it is necessary to cite authorities. We think the language of the statute, however, is sufficiently plain to indicate the purpose for which the Legislature enacted it, and that in order to bring the defendant within the purview and meaning of that statute it must be shown that he was inducing the girl to submit herself to other men than himself or to become an inmate of a house of ill-fame, or to prostitute her body to other men. That was clearly the purpose

for which this Act was passed by the Legislature. To hold otherwise would be to confound this statute with the other statutes on adultery, fornication, etc. Under this view of the case the court was clearly wrong in not defining prostitution, and also in not instructing the jury, so that they would understand that the mere fact of these parties living together in adultery would not authorize a conviction under this statute.

Motion was made to quash that count in the indictment under which appellant was convicted, because it failed to allege the State in which the girl was induced to go. The writer is of the opinion it would be well enough to make it more explicit on this point.

For the reasons indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*